are going to begin today. We had a little switch in the order and we appreciate your accommodation. I guess one of the attorneys is stuck on the highway, so thank you for helping us to stick to our schedule. And we'll begin with Acosta v. Miami-Dade County. We'll hear first from Mr. Karp. Good morning, and may it please the court. My name is David Karp, and I'm joined by my co-counsel Holly Credit. I want to thank the court for giving us the opportunity to represent Mrs. Acosta on behalf of her late son, Mr. Barrera. As the court knows, this appeal is from the district court's grand assembly judgment on two separate claims, an excessive force claim and wrongful death claim. And both of those claims arose from an incident that happened in February 2014 over a span of, depending on how you approximately at Mr. Barrera's apartment. And it began with his mother's cry for help and ended, unfortunately, with Mr. Barrera in cardiac arrest in a police vehicle. And I'd like to address the excessive force claim first. Now, Your Honor, although there's much in dispute in this case, there actually is agreement about some of the legal principles. The county in its brief acknowledges that there's really no dispute about the broad-based legal principle that once a suspect has stopped resisting, officers cannot continue to use gratuitous force, and that constitutes excessive force. And so the question is really a factual one, and whether there's a factual dispute sufficient to survive summary judgment. And I want to get right to the critical evidence that we point to, and that concerns the testimony from an eyewitness at the end of the chase when Mr. Barrera and officers are admittedly initially struggling. There's no question about that. But then at some point, this eyewitness, whose name is Mrs. McKenzie, testifies. And this testimony is at docket 71-18, which is her deposition, page 26. I'm just going to read from you, starting at line 14, and please excuse some of the grammatical issues in this testimony. But here's what she says. What I don't understand, when they got him on the ground and they put him in the yoke, why did they still have to? He was. Once they got him on the ground, he was calm. He was okay. Once the other one came and they had him in the yoke and put it, they didn't have to do all that because the man was gone. All they had to do was put the cuffs and stand him up. Instead, no. All of them jumped out of the car, out the car, about six of them, and they were tasing the man. Can I ask you a quick question? So yeah, I've sort of zeroed in on the same testimony from I think it might also be helpful to you. It requires a bit more piecing together, but her story is a little bit different. As I understand it, it's that tased him, he fell, and then she says he was just lying there. And then she says, then they kicked him. Right? So Flowers says he subdued, then kicked. McKenzie says he subdued, then tased. That's right, Your Honor. That's exactly, that's an accurate description of the two things. Inconsistent or is it possible that they just like both happened or? I don't think they're inconsistent, Your Honor. I think it's possible they both happened. They were both at different vantage points. Mrs. Flowers, at one point she says she's about two and a half car lengths away. Then she says she's actually further down the street, so she's between four and six car lengths. And then finally she says, well, maybe it was more like two and a half car lengths. By comparison, Mrs. McKenzie says she's on the sidewalk and getting as close as possible to this incident. And in fact, one of the officers is telling her, step back, step away, because she's yelling at them. She's yelling at them, stop it, you're killing him. And in fact, she's close enough that she testifies, she can hear one of the officers tell him, I will kill you. So she's in a closer proximity. Mrs. Flowers does say at one point in her deposition that officers were surrounding him, so it's possible that's why she didn't see it. Her deposition was also seven years after the fact. Let me put it this way, sort of. I mean, because we have to look at this from the vantage point of summary judgment, where we have to draw reasonable inferences in favor of the non-moving party. Is there a I don't think that either our inconsistence and, in fact, our theory is that both happened, that he was both kicked and he was both tased. There certainly is plenty of medical evidence of bruises and contusions on him that could have come from a kick. So I don't think they're inconsistent at all. And certainly, under this court's case law, in order to discount summary judgment testimony, as the court knows, the testimony has to be blatantly inconsistent or inconsistent, you know, as a matter of objective fact. I mean, we don't have a video that would provide objective fact here. There's certainly no... Then which one would we discount in that case? Would we discount both of them because they're inconsistent, or would we have to choose which one to believe? I think you would believe both of them because they're not inconsistent. Right, but what I'm saying is if they were inconsistent, wouldn't we still have a material issue of fact? Because how do we know which one to pick? Yes, Your Honor, we agree with that absolutely. Picking which version of events to believe is why we have juries. They assess the credibility, they decide who's more believable, and who to believe. Can I turn your attention for a moment to the second issue? Certainly. So there, I'm not seeing any affirmative evidence that your client put on that the cause of death was something other than what the expert coroner arrived at. And I wonder if you could point me to something in the record that would show some kind of affirmative evidence that it was caused by the tasing and or the beating. Certainly, Your Honor. There's a few pieces of evidence that a jury certainly could rely on to reach the causation. And I think I would begin with the medical records from Jackson Memorial Hospital, where the treating physician and the treating medical professionals actually saw Mr. Barrera, actually treated him. And in the medical records in the note, they identify as the immediate cause of I noticed that. It looked like it was signed by the nurse who was on duty, not the doctor, is that right? And although we, of course, have tremendous respect for the nurses, there's no indication there as to what qualifications she would have to allow us to be able to rely on that. And even if it had been signed by a doctor, still, we don't know what was done because they weren't deposed. So how can we rely on that? You're right. The nurse signed the form, but above this part of the form is the doctor's name. And I think a reasonable inference, as often happens in emergency room, is that the doctor told the nurse what the diagnosis was. And the nurse simply did the ministerial task of filling in the form. Even so, though, is there a reason your client didn't depose the doctor? I mean, the problem is we don't know on what basis the doctor said that. And so it becomes very difficult to use that as significant as any kind of evidence, really, to create a factual issue. Well, Your Honor, I certainly think there's other indications in those same medical records of the multiple blunt force trauma. I'm sorry to interrupt, but there's no question that he had multiple blunt force trauma. The problem is that it's your client's burden to show that that was the cause of his death. And what I'm not seeing is evidence that connects the blunt force trauma, which was, without question, awful. But still, I'm not seeing where there's a connection between that and the death, at least one on the record that we can use. We certainly can use the other expert report from Dr. Vilke. Now, that's the county's expert, but nevertheless, we believe it actually supports our version of events. His fifth opinion in his expert report concludes that Mr. Brer died from a combination of events, not one sole cause, but a combination of events. And he lists his cocaine, the cocaine and flaca in his system. He lists the fact that he had an enlarged heart, although you take the plaintiff as you find it. The fact that he had a large heart can't really be held against him for purposes of negligence. And then the third thing that their own expert identified was his continued physical exertion, that the stress of the events of chasing and struggling with the officers stressed his heart so much that it contributed, was one of the contributing causes, to the cardiac arrest. But the problem with that is that that still doesn't take us between the beating and the death, because the continued physical exertion on his part was resistance. And so, I'm not seeing the connection still in the record. From a common sense point, yes, but in the record between the physical beating and the death, and that's the issue. I understand. I understand, Your Honor. But let me offer you this. Dr. Vilke does say that the exertion came from his resistance. But as a medical matter, he certainly can reach that conclusion as an expert. But just as a matter of common sense, a jury could reasonably infer that this exertion was both from Mr. Brer's own actions and the physical force used upon him. It's simply common sense that if you are kicked repeatedly, if you are tased eight times, that is going to cause stress to your body, and it's going to be part of the exertion that their own expert says was a contributing cause. And that's all we need. We just need to show that it was a substantial factor and that there's some evidence from which a reasonable jury could conclude that the officer's actions caused his death. Can I ask you just one follow-up briefly? I know you're over your time, but where does the evidence of the subdural hematoma fit within sort of the constellation of evidence that you're referring to in responding to Judge Rosenbaum? Yes, Your Honor. So certainly the subdural hematoma, the bleeding in the brain, fits with the evidence that the blunt force trauma was a cause of his death. I mean, I think a jury can reasonably infer that if you're being kicked, that could have been the cause of the injury to his brain and the bleeding in his brain. Thank you very much. And Mr. Karp, you've reserved four minutes. We'll hear next from Ms. Hockstad. Did I get that right? Yes, Your Honor. Good morning. May it please the Court, Assistant County Attorney Jennifer Hockstad on behalf of Appalachia's Six Miami-Dade Police Officers. The District Court correctly granted summary judgment in this case based on what the undisputed record evidence showed, which is that on the night of May 27, 2014, Miami-Dade Police were dealing with a violent, dangerous subject who seemed possessed. He was high on cocaine and flakka. Let me just ask you this. Do you agree with Mr. Karp's statement that there is agreement about the legal principles involved here that basically, paraphrasing, that, you know, once a subject is subdued, no longer resisting, the officers can't use gratuitous force. You agree with that proposition? I agree with the proposition, Your Honor, that once a subject is subdued and no longer poses a danger to the officers, gratuitous use of force, of course, is excessive. And the converse, which is sort of why the brief seemed like two ships passing in the night, because we really don't disagree on the legal principles. It's like they have a narrative going that isn't supported by the undisputed record. Well, well, I mean, I think, you know, I think in fairness, he says, basically, look, my case hinges on what happened once the suspect was down. He says, you know, forget about that. He says, look, there was a lot of violence that predated or, you know, sort of preceded him being put on the ground and subdued. Now I want to talk about whether what happened thereafter was excessive force. And so I don't really think it behooves you to say, oh, there was all this violence that led up to him being put on the ground. Now let's talk about what happened once he was on the ground, right? I do understand that, Your Honor, but it does inform what the officers know at that moment, which is to be considered under a totality of the circumstances analysis as to what informs the amount of force that is used at that moment. And taking us straight to what I believe, and their briefs certainly indicate, appear to be the heart of the matter here, which is the testimony from Ms. McKenzie and from Ms. Flowers. The testimony from Ms. McKenzie on page 26 of her deposition, which is, which is the testimony that you discussed with counsel. Now, appellant claims that this testimony unambiguously states that the officers continued to tase Barrera when he was quote calm. But in fairness, I mean, whether it's unambiguous or ambiguous, I mean, all he needs is an inference, right? Well, he needs a reasonable inference inference, but he doesn't need smoking gun unambiguous testimony, right? I mean, he needs testimony from which a jury could reasonably conclude that something bad happened after he was subdued. Not just something bad, Your Honor, something excessive force, excessive force on constitutional, which we've agreed is any force exerted against a suspect who is subdued and no longer resisting, correct? Subdued, restrained, and no longer posing a danger to the officers. Yes, Your Honor. And that is not what Ms. McKenzie testifies to. And the characterization of Ms. McKenzie's testimony is wrong. I think for two reasons. First, it's really not even clear what she means here in order to reach where the appellant wants this court to go. You have to ignore 25 pages of very clear testimony when asked what happened and in what order her testimony was that the officers couldn't control Barrera until he was tased. She told us that the only way they got him on the ground is when they tasing him. That's at page 18. She explained that Barrera knocked two officers to the ground. And incidentally, he sent one to the hospital, knocking him unconscious. The other, a former United States Marine, a strong and fit man, he popped open the internal wiring to his breastplate, sending him to the hospital as well. But after knocking those two officers to the ground, that's when all the other officers pulled up, she tells us. And that's when they all started pulling out them tasers, tasing the man. Then that's when they put the cuffs on him. That's Ms. McKenzie's testimony for essentially 25 pages until we reach this segment on page 26. Now, what the appellant is asking this court to do is to ignore all of that and reach an unsupported, speculative narrative based on this testimony on page 26. And Ms. Flowers, who's the other eyewitness that appellant relies on, she basically says even less about the incident, yet her testimony somehow gets even more distorted and that's probably why by the reply brief, appellant all but abandons Ms. Flowers' testimony. Yes, Your Honor. Sorry, I just inhaled. That was very good. Oh, I saw it in anticipation, Your Honor. I appreciate it. But yeah, so before you move to Flowers, I just want to ask you one more question about McKenzie, because I take your point that there's a lot of lead up to what happens on page 26 of the transcript. But when she says, and I guess this is, I mean, I find this I mean, I don't know, does that not kind of whitewash what happened before? Like, you know, she was telling this narrative and it sounds like it was an extremely violent and chaotic encounter. But then it seems like she says, however, once they got him on the ground, he was calm. Once they got him on the ground, he was calm. And in the 25 pages preceding this, you know, she expresses sort of shock and horror over the way the arrest looked and over the way that officers got Mr. Barrera off of the ground. You know, she talked about how she didn't like that he appeared to be hogtied, that one officer grabbed him by the feet while another officer grabbed him by the arms and essentially, in her opinion, dragged him to the police car, threw him in the police car. Those are the things that for 25 pages, she is expressing great dismay over. And so when she said, yes, Your Honor. Imagine for a moment we were in trial. So this is a regular criminal case. And the government presents a witness in its case in chief who testifies to X very firmly and without any ambiguity during the direct testimony. And on a very good cross, undermines a lot of that testimony. And that is the critical piece of testimony in the case. Could a jury not reasonably find that what was said on direct testimony was sufficient evidence to sustain a verdict against that defendant based on that testimony, even though it happened to be undermined with a very effective cross-examination? I understand your point, Your Honor. I'm answering the question. I certainly understand the point. And the jury there is in a position to be weighing that evidence. Yes. So I guess you're really asking us the flip side of that, which is it was the opposite of X. And then here wasn't a cross-examination just on another question, then testifies to X. Why can't a jury say, I believe this, and I don't believe that? I'm really not, Your Honor. I don't think that there is an internal inconsistency at all. And I think what Ms. McKenzie is saying here. But I thought what you had said was for the first 25 pages, this happened. And then on page 26, that happened. So I think you did say that there is an internal inconsistency. But if there's not, then that doesn't help you, I would think, because on page 26, it does seem to be unambiguous, as both Judge Rosenbaum and Judge Newsom have asked you, that she said that Ms. McKenzie said that the arrestee was calm at the point that he was tased by six officers, right? But she doesn't say that, though, Your Honor. She does not say that he's calm and he's being tased at that moment. She does not say that. She says earlier in this line in page 26, once they got him on the ground, he was calm, he was okay. And then later on, in that same paragraph, she says, all of them jumped out their car, about six of them, and they was tasing the man. Yes, they was. It's a huge leap to say that they were tasing him when he was calm. She says that he was gone. And she also says that her whole premise of this is, I don't understand why they did this. He was calm, he was gone, and then they all jumped out and tased him. That's the whole premise of what she's saying. I don't think it's a reasonable inference that she was, that she's testifying that he was tased when he was calm and gone, that that requires the court to fill in some serious gaps with unreasonable inferences. And I guess with respect, I just don't think that's right. I mean, I think if you read the paragraph from stem to stern, after she says he was calm, he was okay, then she says, you know, they didn't have to do all that. The man was gone. All they had to do was put the cuffs on him and stand him up. Instead, no. They jumped on him, or they jumped out the car, six of them, and they tased him. I mean, I think that seems the most reasonable thing in the world to, that this is like just a sequence of events. Well, when she says, for instance, all they had to do was put the cuffs on him and stand him up, we know from her testimony that they couldn't put the cuffs on him and stand him up. But actually, even if we look to the pages before page 26, on page 22, she says, they caught him there on the sidewalk. They just got him on the ground, yoked him, put his knee in his chest, and kept tasing the man. So if we put that, especially if we put that together with what she says on page 26, she's saying that after he's already on the ground, they kept tasing him. I mean, why isn't that also further indication that that's what her position is? What we have from Ms. McKenzie is that Mr. Barrera did not want to be handcuffed. He did not want to be arrested. There's no question that that's true. There's no question. The part where we're talking about is once he's on the ground, and a jury might well decide that it believes the officer's version, and that they had to keep using force after he was on the ground even, or that there was no force used after he was on the ground. But a jury could also believe, either and or both, Ms. McKenzie's testimony and Ms. Flowers' testimony, that after he was on the ground, he was calm, and they kept using force. Ms. McKenzie testifies the only way they got him on the ground, and they're tasing him. That's what she says. Right. But that he was tased 17 times. And so it's not a question of he was just tased before he was on the ground. Maybe a jury would find that's what happened. But it's also possible, based on the testimony of Ms. McKenzie, that a jury could find that he was tased not only before he was on the ground, but also after he was on the ground. Why is that not the case? But even to say that he was tased 17 times, Your Honor, is a mischaracterization of the evidence by the appellants. The only tasing they seem to take issue with is Lt. Maldonado's final taser application. The 17 tasers includes about 15 taser applications. But the point is the same. Why could a jury not find that he was tased both before he was on the ground and after he was on the ground, based on Ms. McKenzie's testimony? Because Ms. McKenzie testifies that they only get him on the ground. But both of those things could be true. I think what Judge Rosenbaum is asking you is, yes, it was necessary to tase him, to get him onto the ground. Now he's on the ground. Can you tase him again? If he's wrong, the answer is no. We don't have any testimony from Ms. McKenzie that at that point he is subdued and restrained and no longer posing a danger to the officers. That's the link that's missing here. The restraint part I'm having, you've mentioned it a couple times. I'm a little confused by it. I want to read a part of your brief, because this is when I understood the agreement between the parties to be on the law. It's from page 29. And this is the red brief, the county's brief. What's more, Acosta appeals to broad-based legal principles that nobody disputes, i.e. that the gratuitous use of force against a suspect who has stopped resisting is excessive. I think that's a correct statement. I think that's exactly right. Yes, Your Honor. It doesn't seem to me that one has to be handcuffed for that to be true. If the suspect, let's just assume the facts. I know you don't agree with this. But if at the point he's standing and he's tased and he's on the ground and he's just laying like this without any movement at all, you would agree that it would not be okay at that point to then kick him or tase him, right? Yes, Your Honor. Okay. So the only question is simply whether the testimony that we flagged from pages 22 and 26 of the deposition show that he was like this or if it shows that he was still resisting, right? If he was subdued, yes, Your Honor. Right. Okay. I just want to be talking about here, and this is underlined in your brief here, stopped resisting. That's the key, right? Yes, Your Honor. Okay. At this point... Can I ask one other question? Yes, Judge. Let's assume that I completely disagree with you about your reading of that part of the deposition. There's still a piece that the parties never really hone in on. They sort of dance around it, who's individually responsible at that point? Let's assume that I read the testimony to be that there were six officers that were there. So as I understand it, in the light most favorable to the defendant or to the plaintiff, Officer Ballesteros, and I hope I'm saying that right, has him in the yoke, has him in the headlock on the ground, and then about six officers, I think is the testimony, then tase him. Gomez has been dismissed. So whether Gomez did it or not is insufficient. Does that mean Maldonado, Meade, who does that leave us with? By their own briefing, the appellant describes the 17th taser application by Lieutenant Maldonado. Meade wasn't tasing at that point. The undisputed evidence shows... Doesn't Maldonado testify, though, that at that point when they jumped out of the car and he was on the ground, that five of them did tase? No, Your Honor. No, Your Honor. Professor Maldonado doesn't testify that he, Meade, Rodriguez, Noriega, and Ferreira, the five officers, aside from Ballesteros and Gomez, were involved in the restraint of Barrera? In the restraint, yes, Your Honor, but not all five of them tased. No, Your Honor. What about the Flowers testimony? As I asked Mr. Karp at the beginning, he talks about kicking, right? Is it possible that, to Judge Luck's question, that multiple officers were involved in kicking once he was subdued? So, Ms. Flowers' testimony, which appellant argues the district court discounted, and in their brief at page 39 says Ms. Flowers testified that the officers continued to kick Barrera even after he was handcuffed, which is not supported by the record evidence anywhere. As close as they get to establishing anything with Ms. Flowers is to say that once Barrera was finally, quote, laying on the ground, that something happened. Yeah, I mean, she says, right, he got tased, he fell, and then they kicked him, right? Yes, Your Honor. I mean, I guess to Judge Luck's question, the they is a multiple they, right? I mean, like, so I agree with you that I think Flowers' testimony requires a little bit more piecing together than the McKenzie testimony, but if you piece it together to mean that he was tased and he fell and then he was just lying there, all of these things she said, and then they kicked him, who's the they? The they at that point, the only person in the entire record who says a kick was administered is Officer Noriega. That is the only person who says a kick was administered. Officer Rodriguez, may I finish, Your Honor? I'm sorry. I'm over my time. May I complete? May I conclude? Yes, finish your question. Thank you, Your Honor. I don't have that kind of authority here. Thank you, Your Honor. So the only person in the entire record who talks about a kick is Officer Noriega. Officer Rodriguez administered distractionary strikes. We know that Gomez was incapacitated. Meade is off to the side. Ballesteros is under Barrera. And so the only kick in this entire record is from Officer Noriega. So thank you, counsel. Thank you, Your Honor. All right, Mr. Karp, you've reserved four minutes. Counsel, before you start, can you focus on the who? Yes, Your Honor. Let's assume I agree with everything you've said here. And I can tell you that I largely do. But focus on the who for me. Sure, Your Honor. I would direct the court's attention to page 27 and 28 of Mrs. McKenzie's deposition. And I have that here. It's docket entry 7118. And so let's go to line 20, which is at the bottom. Question is, no problem. It was six or it was more than six police officers who shot their taser. Answer. When I seen the officers jumping out the car, I counted six of them. I said about six of them. All of them policies or polices on that one man, Jesus. Question and answer. Didn't make no sense. And here's the critical part. Question. All six shot their tasers. Answer. Yeah, they were shooting. Yeah, all of them, except the one that had him in the yoke, which would be Officer Ballesteros. You agree based on that, that Officer Ballesteros is not liable for at least the tasing part? Yes, I think that's a fair. Yes, I think that's right. That's a big deal for Officer Ballesteros. Absolutely. Okay, so that leaves us, I think, with Gomez, but Gomez is gone because he was dismissed. Mead, Noriega, Maldonado. And I read it before and I'm sorry. Am I right about that? Yes, Your Honor. The five that I read out loud. Those are the ones that are left. We're left with. Yes, Your Honor. Well, there's six. There's six remaining, not including Ballesteros. And the names are, you know, they're the remaining defendants in the case. And they're Ballesteros, Mead, Officer Ferrer, Officer Maldonado, Officer Noriega. And Gomez, who's gone. Gomez is dismissed. So it's really the five that's left, which is Maldonado, Mead, Rodriguez, Noriega, and Ferrer. And really getting that because they admit Officer Maldonado says those are the ones involved in restraining him when they're at that intersection at that point, right? Yes. So we have to read that together with Ms. Flowers' testimony. I think that's right, Your Honor. In the limited time, I just wanted to circle back briefly to Judge Rosenbaum's question in the initial part of the argument, which was about the wrongful death claim. And we were discussing what sort of affirmative evidence we had put forward. Part of the district court's decision was also giving credit to the alternative theory put on by the county's experts. And I just want to mention that we did retain our own expert, Dr. Stockham, whose report does a good job that a jury could certainly accept to discredit Dr. Liu and the medical examiner's opinion that his death was caused by the drugs in his body. So I agree that there is a question of fact about whether it was caused by the drugs in his body. The problem is you still have to put on evidence that it was caused by the defendants. And she specifically says, I can't testify to that. I'm not an expert in that. And so that kind of leaves this hole in your case, especially because we also know that, you know, there's testimony about delirium. And even though she might have testified that he didn't die from a drug overdose, delirium and enlarged heart, et cetera, that still leaves those as possibilities. That's the problem. Your Honor, I think the medical examiner ruled out excited delirium. So I don't think either side is relying on that. But your point is well taken that there's some discussion of that. But you're right. It leads us back to the first part of your question, which is the affirmative evidence. And we submit there is evidence, given the low standard under Florida law, from which a jury of reasonable intelligence could piece this together. Because I think what happened here, if you accept the expert's opinion, is puzzling. I mean, Mr. Barrera arrived badly beaten. He was tased conservatively, if you accept Ms. McKenzie's testimony, 14 times. Had brain injury. To get there from the county's conclusion, I think a reasonable jury could find that unconvincing and find that our explanation is supported by the evidence. And I think, unless the court has further questions, I thank the court for your time and we would ask you to reverse. All right. Thank you very much. And Mr. Karp, we note that you were appointed by the court. We thank you and Ms. Credit for your work here and for accepting the appointment. And we thank both counsel for their argument today. Our pleasure. Thank you. Okay, thank you. All righty. Our next case is United States of America versus Chavat and Soto.